**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge Robert E. Blackburn**

Civil Action No. 11-cv-00502-REB

DANIEL G. SELF,

      Applicant,

v.

KEVIN MILYARD, Warden, Sterling Correction Facility, and
THE ATTORNEY GENERAL OF THE STATE OF COLORADO,

      Respondents.

---

## ORDER ON APPLICATION FOR WRIT OF HABEAS CORPUS

---

**Blackburn, J.**

This matter is before me on the ***pro se* Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254** ("Application") [#1][1] filed on March 1, 2011, by Applicant Daniel G. Self.  Respondents filed an Answer [#18], and Applicant filed a Traverse [#19].

After reviewing the pertinent portions of the record in this case including the Application, the Answer, the Traverse, and the state court record [#13], I conclude that the Application should be denied.

---

[1] [#1 ] is an example of the convention I use to identify the docket number assigned to a specific paper by the Court's electronic case filing and management system (CM/ECF).  I use this convention throughout this order.

## I. Background[2]

On March 27, 2003, Applicant called 911 from his home and informed the operator that his pregnant girlfriend, L.G., who was a heroin addict, had shot herself in the head.  Applicant claimed that the shooting was an apparent suicide attempt. Paramedics and police responded to the scene.  Police officers asked Applicant several questions, entered the home where they observed paramedics assisting L.G., returned to where Applicant was sitting on the porch, and continued to question him.  At one point, Applicant contradicted himself and police opted to test his hands for gun shot residue (GSR) but did not advise him of his rights at this time.  The police took Applicant to the police station where they continued to question him for thirty to forty-five minutes. At the same time, another police officer applied for a search warrant, entered the home, collected evidence, and diagramed the scene.  Subsequently, Applicant was charged with first degree murder.

Mr. Self was convicted by a jury of one count of first degree murder after deliberation in El Paso County District Court Case No. 03CR1450 and was sentenced to life without the possibility of parole.  Mr. Self filed a direct appeal.  The Colorado Court of Appeals affirmed Mr. Self's conviction and sentence, but vacated the order of restitution and remanded the matter for a hearing.  *See People v. Self*, No. 04CA1542 (Colo. App. Aug. 9, 2007).  Mr. Self filed a petition for certiorari review; on October 6, 2008, the Colorado Supreme Court (CSC) denied the petition.  Pre-Answer Resp. (#7-

---

[2]The factual background of this case is taken from the statement in Applicant's opening brief on direct appeal and the Colorado Court of Appeals' (CCA's) opinion.  *People v. Self*, No. 04CA1542 at 2-3 (Colo. App. Aug. 9, 2007) (unpublished); Pre-Answer Resp. App. A (# 7-1) at 2.

10) at App. J.  Mr. Self then filed with the United States Supreme Court a petition for certiorari review, which on April 20, 2009, was denied.  *Id.* at App. M.  On June 10, 2009, Mr. Self filed a Colo. R. Crim. P. 35(c) postconviction motion.[3]  The state trial court denied the motion, Mr. Self appealed, and on September 9, 2010, the CCA affirmed the state trial court's denial.  *Id.* at App. R.  Mr. Self petitioned the CSC for a writ of certiorari; on January 18, 2011, the petition was denied.  *Id.* at App. T.

On March 1, 2011, Applicant filed this Application.  I conducted a preliminary review and dismissed the ineffective assistance of counsel issue raised in Claim One and all of Claim Two as procedurally barred.  The remaining claims for relief include:

> Claim One – prosecutorial misconduct;
>
> Claim Three – trial court error in allowing prosecution's comments on the death and delivery of a fetus;
>
> Claim Four – trial court error in admitting out-of-court statements based on excited utterances and other act evidence;
>
> Claim Five – trial court error in admitting statements made in violation of *Miranda*; and
>
> Claim Six – CCA error in invoking exceptions to the warrant requirement, in violation of the rights to remain silent and effective assistance of counsel.

## II.  Analysis

A.  Standard of Review

Because Applicant is not represented by an attorney, I must construe the Application liberally.  *See Haines v. Kerner*, 404 U.S. 519, 520 (1972); *Hall v.*

---

[3]After Mr. Self filed the Rule 35(c) motion, he filed a 28 U.S.C. § 2254 application in this Court.  The case was dismissed without prejudice as a mixed petition.  *See Self v. Milyard, et al.,* No. 09-cv-01525-ZLW (D. Colo. Sept. 24, 2009) (unpublished).

*Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  However, I cannot act as an advocate

for a *pro se* litigant.  *See Hall*, 935 F.2d at 1110.

Title 28 U.S.C. § 2254(d) provides that a writ of habeas corpus may not be

issued with respect to any claim that was adjudicated on the merits in state court,

unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d).

I review claims of legal error and mixed questions of law and fact pursuant to 28

U.S.C. § 2254(d)(1).  *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir. 2003).  Under

§ 2254(d)(1), the threshold question is whether Applicant seeks to apply a rule of law

that was clearly established by the Supreme Court at the time his conviction became

final.  *See Williams v. Taylor*, 529 U.S. 362, 390 (2000).  The "review under

§ 2254(d) is limited to the record that was before the state court that adjudicated the

prisoner's claim on the merits."  *Cullen v. Pinholster*, ---- U.S. ----, 131 S. Ct. 1388,

1398 (2011).  "Finality occurs when direct state appeals have been exhausted and a

petition for writ of certiorari from this Court has become time barred or has been

disposed of."  *Greene v. Fisher*, ---- U. S. ----, 132 S.Ct. 38, 44 (2011) (citing *Griffith v.*

*Kentucky*, 479 U.S. 314, 321, n. 6 (1987).

Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. Furthermore,

> clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008).

If there is no clearly established federal law, that is the end of my inquiry pursuant to § 2254(d)(1). *See id.* at 1018. If a clearly established rule of federal law is implicated, I must determine whether the state court's decision was contrary to or an unreasonable application of that clearly established rule of federal law. *See Williams*, 529 U.S. at 404-05.

> A state-court decision is contrary to clearly established federal law if: (a) "the state court applies a rule that contradicts the governing law set forth in Supreme Court cases"; or (b) "the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [that] precedent." *Maynard* [*v. Boone*], 468 F.3d [665,] 669 [(10th Cir. 2006)] (internal quotation marks and brackets omitted) (quoting *Williams*, 529 U.S. at 405). "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.' " *Williams*, 529 U.S. at 405 (citation omitted).

> A state court decision involves an unreasonable application of clearly established federal law when it identifies the correct governing legal rule from Supreme Court cases, but unreasonably applies it to the facts. *Id.* at 407-08. Additionally, we have recognized that an unreasonable application may occur if the state court either unreasonably extends, or unreasonably refuses to extend, a legal principle from Supreme Court precedent to a new context where it should apply. *Carter* [*v. Ward*], 347

F3d. [860,] 864 [10th Cir. 2003] (quoting *Valdez* [*v. Ward*, 219 F.3d [1222] 1229-30 [10th Cir. 2000]).

*House*, 527 F.3d at 1018.

My inquiry pursuant to the "unreasonable application" clause is an objective one.

*See Williams*, 529 U.S. at 409-10.  "[A] federal habeas court may not issue the writ

simply because that court concludes in its independent judgment that the relevant

state-court decision applied clearly established federal law erroneously or incorrectly.

Rather that application must also be unreasonable."  *Id.* at 411.  "[A] decision is

'objectively unreasonable' when most reasonable jurists exercising their independent

judgment would conclude the state court misapplied Supreme Court law."  *Maynard*,

468 F.3d at 671.  In addition,

> evaluating whether a rule application was unreasonable requires
> considering the rule's specificity.  The more general the rule, the more
> leeway courts have in reaching outcomes in case-by-case determinations.
> [I]t is not an unreasonable application of clearly established Federal law
> for a state court to decline to apply a specific legal rule that has not been
> squarely established by [the Supreme] Court.

*Harrington v. Richter*, 131 S. Ct. 770, 786,  --- U.S. --- (Jan. 19, 2011) (internal

quotation marks and citation omitted).  I "must determine what arguments or theories

supported or . . . could have supported[ ] the state court's decision" and then "ask

whether it is possible fairminded jurists could disagree that those arguments or theories

are inconsistent with the holding in a prior decision of [the Supreme] Court."  *Id.*  "[E]ven

a strong case for relief does not mean the state court's contrary conclusion was

unreasonable."  *Id.* (citation omitted).  "Section 2254(d) reflects the view that habeas

corpus is a guard against extreme malfunctions in the state criminal justice systems, not

6

a substitute for ordinary error correction through appeal." *Id.* (internal quotation marks and citation omitted).

Under this standard, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Maynard*, 468 F.3d at 671. Furthermore,

> [a]s a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 131 S. Ct. at 786-87.

I review claims of factual errors pursuant to 28 U.S.C. § 2254(d)(2). *See Romano v. Gibson*, 278 F.3d 1145, 1154 n. 4 (10th Cir. 2002). Section 2254(d)(2) allows a court to grant a writ of habeas corpus only if the state court decision was based on an unreasonable determination of the facts in light of the evidence presented. Pursuant to § 2254(e)(1), I must presume that the state court's factual determinations are correct, *see Sumner v. Mata*, 455 U.S. 591, 592-93 (1982), and Applicant bears the burden of rebutting the presumption by clear and convincing evidence, *see Houchin v. Zavaras*, 107 F.3d 1465, 1470 (10th Cir. 1997). "The standard is demanding but not insatiable . . . [because] '[d]eference does not by definition preclude relief.' " *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

A claim, however, may be adjudicated on the merits in state court even in the absence of a statement of reasons by the state court for rejecting the claim. *Richter*, 131 S. Ct. at 784. ("[D]etermining whether a state court's decision resulted from an

unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning").  Furthermore, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 784-85.

In other words, I "owe deference to the state court's result, even if its reasoning is not expressly stated." *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999). Therefore, I "must uphold the state court's summary decision unless [my] independent review of the record and pertinent federal law persuades [me] that [the] result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Id.* at 1178. "[T]his 'independent review' should be distinguished from a full de novo review of the [applicant's] claims." *Id.* (citation omitted).  Likewise, I apply the AEDPA deferential standard of review when a state court adjudicates a federal issue relying solely on a state standard that is at least as favorable to the applicant as the federal standard. *See Harris v. Poppell*, 411 F.3d 1189, 1196 (10th Cir. 2005).  If a claim was not adjudicated on the merits in state court, and if the claim also is not procedurally barred, I must review the claim *de novo* and the deferential standards of § 2254(d) do not apply. *See Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004).

B.  Claim One

In his first claim Applicant alleges prosecutorial misconduct.  He asserts that the prosecutors repeatedly stated to the trial court, defense counsel, and the jury that their witnesses did not receive reciprocity for their testimony in Applicant's criminal

proceedings, even though the witnesses' criminal record belies the prosecutors' statements.  Respondents argue that the only evidence Applicant offers in support of this allegation is his personal opinion that the witnesses' own criminal cases resulted in "lenient plea deals."  Answer at 24.  Applicant asserts in his Traverse, relying on ***Taylor v. Maddox***, 366 F.3d 992, 1001 (9th Cir. 2004), that a summary dismissal of this claim by the lower Colorado court is based on an unreasonable fact-finding procedure and the AEDPA deference standard does not apply.  Applicant concludes that I must accept the facts he has asserted as true and proceed with an evidentiary hearing.

With respect to Claim One, the CCA found as follows:

> We concur with the trial court's assessment of Self's allegations. Although Self argues that the witnesses received favorable dispositions in their cases, his conclusory allegations, even if true, do not establish that either disposition was (1) the result of testimony provided in this case; or (2) so unusual, either in substance or timing, as to support an inference of such a connection.  ***See generally United States v. Molina***, 75 F.3d 600, 602 (10th Cir. 1996) (the mere fact that witnesses were allowed to plead guilty on favorable terms is not evidence that plea agreements were secretly reached prior to the witnesses' testimony and improperly withheld from the defense).
>
> Accordingly, we see no error in the trial court's decision to summarily deny the motion without appointing counsel.

***People v. Self***, No. 09CA1320, 3-4 (Colo. App. Sept. 9, 2010).

Habeas relief is available for prosecutorial misconduct only when the misconduct is so egregious that it renders the entire trial fundamentally unfair.  ***See Donnelly v. DeChristoforo***, 416 U.S. 637, 645-48 (1974).  In order to determine whether prosecutorial misconduct rendered the trial fundamentally unfair, I must consider "the totality of the circumstances, evaluating the prosecutor[s'] conduct in the context of the whole trial."  ***See Jackson v. Shanks***, 143 F.3d 1313, 1322 (10th Cir. 1998).  The

prosecution is forbidden from deliberately deceiving the court and jury. **See Gray v. Netherland**, 518 U.S. 152, 165 (1996). Applicant bears the burden of establishing a claim of deception, which I review de novo. **See Foster v. Ward**, 182 F.3d 1177, 1191-92 (10th Cir. 1999).

I have reviewed Applicant's opening brief on appeal in his Colo. R. Crim. P. 35(c) postconviction motion. Applicant presented no credible evidence that prosecutors offered either informant leniency in exchange for their testimony against him and deliberately deceived the court and jury. Informants subsequent plea to favorable terms in their criminal proceedings is not evidence that a plea agreement was reached secretly prior to a witness's testimony. **See Molina**, 75 F.3d at 602. Applicant has failed to rebut the presumption that state court's factual determinations are correct by clear and convincing evidence.

The CCA decision regarding this claim did not result in a decision that was contrary to, or involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Claim One, therefore, lacks merit and will be dismissed.

C.  Claim Three

In Claim Three Applicant asserts the trial court ruled that the evidence of the death of the unborn fetus "would not be allowed more than a 'couple' of times, being unduly prejudicial." Application at 7. Applicant further asserts that his due process rights were violated under **United States v. Young**, 470 U.S. 1, 10-11 (1985), when the

trial court erred in allowing the prosecution's repeated comments on the death and

delivery of an unborn fetus.[4]

In his opening brief on appeal, Applicant stated as follows:

> In the opening statement, the prosecutor said: "You'll hear the disturbing fact that she was seven months pregnant;" "You will hear disturbing facts that the baby died;" and told them twice more that Gee "was seven months pregnant." ([Vol.] XIV, 377, 378, 380)  She said the paramedic's "immediate concern was . . . trying to save the baby,' and Gee was kept alive "long enough to deliver the baby which later died." ([Vol.] XIV, 387, 389). . . .

> In closing argument, the prosecutor said "we will never know if she would have become . . . the mother to the child that she was carrying" ([Vol.] XX, 1969)  She argued that while Mr. Self was getting rid of the drugs in the house "the baby is dying," repeating this a second time for emphasis.  ([Vol.] XX, 1993)  On rebuttal, she told the jury "He killed Leah Gee, a 24 year-old young lady pregnant with a seven-month-old fetus inside of her.  He did it."  ([Vol.] XX, 2012)

Pre-Answer Resp., # 7-1 at 55 and 58.

With respect to Claim Three, the CCA found as follows:

> Self contends that his rights to a fair trial and an impartial jury were denied by the admission of evidence regarding the delivery and death of the fetus and the emphasis placed on this evidence, in violation of a pretrial order.  We disagree.

> A defendant has a right to a fair trial, an impartial jury, and the preclusion of irrelevant evidence or evidence whose probative value is substantially outweighed by the danger of unfair prejudice.  *Harris v.*

---

[4]  In the Traverse, Applicant attempts to raise a double jeopardy claim and a malicious prosecution claim.  Applicant also seeks to incorporate all the arguments he asserted on pages 46-53 in his opening brief on direct appeal in state court.  I need not address claims raised for the first time in a reply brief.  *See United States v. Mora*, 293 F.3d 1213, 1216 (10th Cir., 2002) (citing *Codner v. United States*, 17 F.3d 1331, 1332 n. 2 (10th Cir. 1994); *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 724 (10th Cir. 1993)).  Furthermore, Applicant fails to assert a factual basis to support either a double jeopardy claim or a malicious prosecution claim.  As for the incorporation of all arguments asserted on pages 46-53 of his opening brief in his direct appeal, it is not a judicial function to assist Applicant in stating the factual support for a claim.  *Hall*, 935 F.2d at 1110.  To the extent, however, that the factual allegations in the opening brief support Claim Three, I will consider the allegations.

*People*, 888 P.2d 259, 263 (Colo. 1995). "Unfair prejudice" refers to evidence having "an undue tendency to suggest a decision on an improper basis, commonly but not necessarily an emotional one, such as sympathy, hatred, contempt, retribution, or horror." *People v. Dist. Court*, 785 F.2d 141, 147 (Colo. 1990).

Similarly, a prosecutor may not use arguments calculated to inflame the passions or prejudices of the jury, or to mislead the jury as to the inferences it may draw from the evidence. *Harris*, 888 P.2d at 264.

A reviewing court may not reverse a trial court's decision to admit or exclude evidence absent a showing that the trial court abused its discretion. An abuse of discretion occurs when a decision is manifestly arbitrary, unreasonable, or unfair. *People v. Welsh*, 80 P.3d 296, 304 (Colo. 2003). We also review arguments challenged as prosecutorial misconduct under an abuse of discretion standard, and the trial court's rulings in that regard will not be disturbed on appeal absent a gross abuse of discretion. *Dunton v. People*, 898 P.2d 571, 574 (Colo. 1995).

Here, Self filed a motion in limine to prohibit any reference to the delivery and death of the victim's child as inflammatory and prejudicial. The trial court ruled that the prosecution could elicit testimony that the victim was pregnant and the child had died, but cautioned:

> [T]he court will not allow a dissertation of how the child died, that the child was alive for [17] days, the child -- the attempt to save the child's life basically, but the court will allow the fact that the individual was pregnant and that the child died. And you only need a couple of questions in that regard. We don't need to spend a lot of time.

## C.  Prosecutorial Misconduct

Finally, Self alleges that the trial court abused its discretion in allowing six statements by the prosecutor during opening statement and closing argument. We disagree.

Because Self did not object to any of these statements, we review for plain error. Plain error during closing argument must be flagrant or glaringly or tremendously improper, and it must so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. Prosecutorial misconduct in closing argument rarely constitutes plain error. *People v. Weinreich*, 98 P.3d 920, 924 (Colo. App. 2004), *aff'd*, 119 P.3d 1073 (Colo. 2005).

Self objects to the prosecutor's statements in opening argument that the victim was seven months pregnant, that the baby died, and that the paramedics' immediate concern was trying to save the baby.  Contrary to Self's contention, these statements were consistent with the trial court's ruling on the motion in limine.

Self also objects to three statements made by the prosecutor in closing argument.  One was that "we will never know if she [the victim] would have become . . . the mother to the child she was carrying."  The prosecutor also stated that while Self was getting rid of drugs in the house, "the baby is dying."  On rebuttal, the prosecutor told the jury, "He killed [the victim], a 24-year-old young lady pregnant with a seven month old fetus inside of her.  He did it."  While these statements were dramatic and argumentative, that is the purpose of closing argument.  These statements did not involve a dissertation on the details of the child's death and were fair statements based upon the evidence presented at trial.  Accordingly, the trial court did not abuse its discretion or commit plain error with respect to the prosecutor's opening and closing statements.

*Self*, No. 04CA1542, at 41-43 and 46-48.

I will address Applicant's third claim as set forth in the Application, which claim includes only Applicant's challenges of the prosecutors' remarks concerning the evidence of the death of an unborn fetus and the trial court's failure to enforce its own ruling regarding the comments.  Applicant's double jeopardy and malicious prosecution claims, raised for the first time in his Traverse, are inappropriately raised pursuant to *Mora* and most likely barred from federal habeas review either as time-barred under 28 U.S.C. § 2244(d) or unexhausted and procedurally barred pursuant to *Steele v . Young*, 11 F.3d 1518, 1521 (10th Cir. 1993) (citations omitted).  At the very least, the claims do not relate back to Applicant's original Application filed on March 1, 2011, and consequently are successive and improperly before me for lack of jurisdiction.[5]

---

[5]  Pursuant to 28 U.S.C. § 2244(b)(3), Applicant must obtain an order from the United States Court of Appeals for the Tenth Circuit authorizing this Court to consider successive § 2254 claims.  In the absence of such authorization, this Court lacks

"Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." *Young*, 470 U.S. at 11. The courts must "consider the probable effect the prosecutor's [statements] would have on the jury's ability to judge the evidence fairly." *Tillman v. Cook*, 215 F.3d 1116, 1129 (10th Cir. 2000) (quoting *Moore v. Reynolds*, 153 F.3d 1086, 1113 (10th Cir. 1998), *cert. denied*, 526 U.S. 1025 (1999)). The federal habeas court does not consider a prosecutor's statement or argument "word by word in a vacuum." *Paxton v. Ward*, 199 F.3d 1197, 1217 (10th Cir. 1999).

In making this assessment, a court should examine whether "the prosecutor's argument . . . manipulate[d] or misstate[d]" the evidence, "whether it implicate[d] other specific rights of the accused such as the right to counsel or the right to remain silent," whether "the objectionable content was invited by or responsive to the opening summation of the defense," and whether "[t]he weight of the evidence against applicant was heavy." *Darden v. Wainwright*, 477 U.S. 168, 181-82 (1986). "Any cautionary steps-such as instructions to the jury-offered by the court to counteract improper remarks," are also relevant. *Bland v. Sirmons*, 459 F.3d 999, 1024 (10th Cir. 2006) (alteration in original) (internal quotation marks and citation omitted). "Inquiry into fundamental fairness requires examination of the entire proceedings," and "[c]ounsel's failure to object to the comments, while not dispositive, is also relevant to a fundamental

---

jurisdiction to consider the merits of the double jeopardy and malicious prosecution claims asserted in conjunction to alleged prosecutorial remarks. *In re Cline*, 531 F.3d 1249, 1251 (10th Cir. 2008).

fairness assessment." *Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002) (citations omitted and emphasis added).

"[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181 (internal quotation marks omitted). Rather, "[t]he ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct." *Bland*, 459 F.3d at 1024.

A review of the trial court's alleged error is subject to the plain error test. Colorado's plain error test is rooted in due process. *See People v. Kruse*, 839 P.2d 1, 3 (Colo. 1992) ("Plain error occurs when . . . the error so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction.") (internal quotation marks omitted).  Because there is no practical distinction between Colorado's plain error test and the federal due process test that requires reversal when error "so infused the trial with unfairness as to deny due process of law," *Estelle v. McGuire*, 502 U.S. 62, 75 (1991) (internal quotation marks and citation omitted), the deferential standard of review applies unless the CCA unreasonably applied federal due process law, *see Thornburg v. Mullin*, 422 F.3d 1113, 1124-25 (10th Cir. 2005) (citing 28 U.S.C. § 2254(d)).

During the opening and closing statements, the prosecution made the following statements about the death of the unborn fetus:

(1) "You will hear disturbing facts that the baby died."

(2) "[T]hey were pretty certain she was going to die from the injuries, that it was obvious she was pregnant and they were trying to save the baby."

(3) "She was kept alive by a ventilator long enough to deliver the baby which later died."

(4) "We will never know if she would have become . . . the mother to the child that she was carrying."

(5) "All the time that this is happening Leah Gee is dying.  The baby is dying."

(6) "And what is Leah doing?  She's dying.  The baby is dying."

*Self*, No. 03CR1415, Trial Tr. June 2, 2004, Vol II at 377, 387, 389; June 10, 2004, Vol.

VIII at 1969 and 1993.

Defense counsel conceded that the fact of the pregnancy was allowable.  Vol II

at 348.  He, however, argued that

[t]he whole series of events about the child and what happened to the child has nothing to do with whether or not Mr. Self committed murder here.  It has everything to do with prejudice.  It has everything to do with inflaming the jury to make a decision on the fact of what happened to that child rather than whether or not the state has proved beyond a reasonable doubt the elements of the charge of murder.

*Id.*  As stated in part above, the trial court determined as follows:

THE COURT: The Court will allow the district attorney to bring out the fact that the individual was pregnant and that the child died.  That's it.  The Court will not allow a dissertation of how the child died, that the child was alive for 19 days, the child - - the attempt to save the child's life basically, but the Court will allow the fact that the individual was pregnant and that the child died.  And you only need a couple of questions in that regard.  We don't need to spend a lot of time.

And the Court is making that decision based on the fact that I think it would be unduly prejudicial to the defendant if the circumstances of the attempts that they made to save the child's life were went into.

Vol. II at 350-51.

Nothing in the prosecutors' statements during the opening and closing arguments

was contrary to the trial court's pretrial ruling.  The prosecutors' comments did not

manipulate or misstate the evidence, nor were Applicant's specific constitutional rights

16

to counsel or to remain silent compromised. The trial court instructed each of the juror's that an "[o]pening statement, like closing argument, is not evidence. You are to base your decision upon what you hear from the witness stand and the witness stand only." Vol. II at 337. The jury is presumed to have followed this instruction. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

Even if the prosecutors' comments were contrary to the ruling, they did not infuse the trial with unfairness and result in a denial of due process of law. Any prejudicial effect of the prosecutors' comments is diminished by the overwhelming evidence of Applicant's guilt. Evidence was introduced during the trial for consideration by the jury as follows.

Applicant was upset that L.G. was seeing another man with whom she was having a child. Applicant had three guns in his home, a revolver, a semiautomatic, and a shotgun. June 4, 2004, Vol. IV at 877 and 1051-52; June 8, 2004, Vol. VI at 1377-79 and 1422-23.

Two witnesses testified about L.G.'s statements to them regarding two different occasions when Applicant physically abused L.G. prior to the shooting. June 3, 2004, Vol. III at 787-89, 791-94; June 4, 2004, Vol. IV at 881-86 (A limiting instruction was given by the trial court before each witness testified admonishing the jury that they could only consider the testimony to show motive, intent, ill will and to rebut evidence that L.G. committed suicide.). Three other witnesses testified to seeing bruises L.G. incurred as a result of Applicant's physical abuse. Vol. III at 830-33 and 844-46; Vol. VI at 1385-87 (The same limiting instruction was given by the trial court.). L.G. also told one of the witnesses, her mother, that Applicant threatened to kill her, pulled a gun on her, and told

17

her he would shoot her dead and make it look like a suicide.  Vol. III at 804 (Again, a

limiting instruction was given prior to the testimony.).  Several witnesses also testified

that on the night of the shooting Applicant was annoyed or agitated when L.G. had not

returned with his new truck, and he had to go to several different locations with his

friends to try to find his truck.  Vol. V at 1303-04; Vol. VI at 1410-11, 1414-17, 1419, and

1424.

Three witnesses also testified that on the night of the shooting several people,

including L.G., were at Applicant's house using cocaine.  Vol. V at 1315, 1318; Vol. VI at

1380 and 1419-24.  One of the witnesses testified that after he left Applicant's house,

Applicant called and asked him to lie to the police by telling them that he and the other

witness had only dropped Applicant off at his house the night of the shooting.  Vol. V at

1321.  One of the witnesses also testified that during the whole time he was at

Applicant's house, Applicant continued to argue with L.G. Another witness testified that

Applicant was still agitated at the time he left Applicant's house with the other witness.

Vol. V at 1319; Vol. VI at 1415-24.  Two of the witnesses who were at Applicant's home

the night of the shooting testified that when they left Applicant's home, several hours

prior to Applicant calling 911 about the shooting, L.G. was alive.  Vol. V at 1319; Vol VI

at 1382.

Detailed expert testimony analyzed the blood spatter indicating that L.G. was

standing under the doorway of the bedroom, that a hanging blanket was in front of her,

and that the bullet traveled through the blanket from the bedroom into the hallway,

making it impossible for L.G. to have shot herself.  Vol. V at 1214-1259.  Finally, the

coroner for El Paso County, who has twenty-five plus years of experience, testified that

the wound incurred by L.G. was done by a gun that was at least two feet from her body and that it was not physically possible for her to have shot herself in the head.  Vol. IV at 984-88 and 991-93.  He also testified L.G. had recent and fresh bruising on her body that would not have been related to intravenous drug use.  Vol. IV at 980-982

The CCA decision regarding this claim did not result in a decision that was contrary to, or involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Claim Three, therefore, lacks merit and will be dismissed.

D. Claim Four

In Claim Four, Applicant alleges that the trial court erred in admitting out-of-court statements based on excited utterances and other act evidence.  Applicant contends that his Fifth, Sixth, and Fourteenth Amendment rights were violated pursuant to *Coy v. Iowa*, 487 U.S. 1012 (1988), and *Ohio v. Roberts*, 448 U.S. 56 (1980).

Respondents argue that a state trial court's evidentiary rulings should not be disturbed unless the probative value of the evidence is so greatly outweighed by the prejudice the defendant is denied due process.  Respondents contend that Applicant fails to assert or demonstrate how the admission of L.G.'s out-of-court statements were grossly prejudicial, as required under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  Respondents further contend that *Crawford v. Washington*, 541 U.S. 36 (2004), does not pertain to nontestimonial hearsay, which is at issue in this case, and under *Roberts* Applicant cannot demonstrate that the CCA's decision was contrary to federal law.

19

With respect to Claim Four, the CCA found as follows:

A.  Excited Utterances

As noted, Self contends the trial court abused its discretion in admitting L.G.'s statements concerning his prior acts of domestic violence because they were hearsay.  At a pretrial suppression hearing, the trial court ruled the following statements made by L.G. were admissible pursuant to CRE 803(2), the excited utterance hearsay exception: (1) statements to L.G.'s mother, Neal, on Monday, March 3, 2003 at the soup kitchen; (2) statements to L.G's other boyfriend, Lear, at Neal's home on Sunday, March 2 (or Monday, March 3), 2003; (3) statements to Neal while running errands on Tuesday, March 4, 2003; and (4) statements to Neal while sitting on Neal's front porch on Thursday, March 6, 2003.  We agree with the trial court's ruling in part; L.G.'s statements to her mother on March 3 were admissible.  Even if the other statements were not admissible as excited utterances, the court's error in admitting them was harmless, as discussed below.

In reviewing a trial court's suppression ruling, we consider only the record of the pretrial hearing, not the evidence and testimony subsequently presented at trial.  *Moody v. People*, 159 P.3d 611, 614 (Colo. 2007); *People v. Bowers*, 801 P.2d 511, 518 (Colo. 1990).

We review a trial court's decision concerning the admissibility of evidence for an abuse of discretion.  *People v. Ibarra*, 849 P.2d 33, 38 (Colo. 1993).  "A trial court abuses its discretion only when its ruling is manifestly arbitrary, unreasonable, or unfair."  *People v. Stewart*, 55 P.3d 107, 122 (Colo. 2002).  "A trial court necessarily abuses its discretion when it bases its ruling on an erroneous view of the law."  *People v. Garcia*, 169 P.3d 223, 226 (Colo. App. 2007).

Although Self did not contemporaneously object to either Neal's or Lear's testimony at trial, his pretrial motions in limine to suppress the introduction of L.G.'s statements sufficiently preserved the issue for review on appeal.  *See Uptain v. Huntington Lab, Inc.*, 723 P.2d 1322, 1331 (Colo. 1986) ("plaintiff's motion in limine constituted a timely objection for purposes of CRE 103(a)(1)").  "Errors in the admission of evidence, even of constitutional dimension, do not require reversal of a criminal conviction if the errors are harmless beyond a reasonable doubt."  *People v. Herrera*, 87 P.3d 240, 251 (Colo. App. 2003).

CRE 803(2) permits the introduction into evidence of "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  For a statement to be admissible under the excited utterance exception,

> (1) the event must be sufficiently startling to render normal reflective thought processes of the observer inoperative; (2) the statement must be a spontaneous reaction to the event; and (3) direct or circumstantial evidence must exist to allow the jury to infer that the declarant had the opportunity to observe the startling event.

***People v. Compan***, 100 P.3d 533, 536 (Colo. App. 2004), ***aff'd***, 121 P.3d 876 (Colo. 2005).

On appeal, Self challenges only the second element-- the spontaneity of the statements.

"The trial court is in the best position to consider the effect of the startling event on the declarant and is therefore accorded wide discretion in determining admissibility under the excited utterance exception."  ***Id.*** The excited utterance exception "has been liberally interpreted so as to extend to statements made following a lapse of time from the startling event itself."  ***People v. Hulsing***, 825 P.2d 1027, 1031 (Colo. App. 1991) (citing ***People v. Ojeda***, 745 P.2d 274 (Colo. App. 1987)).  "There is no firm time limit because the duration of stress will obviously vary with the intensity of the experience and the 'emotional endowment' of the declarant."  ***Compan***, 100 P.3d at 536.

"Factors to be considered in determining whether the statement was spontaneous include (1) the lapse of time between the startling event and the out-of-court statement, (2) whether the statement was made in response to an inquiry; (3) whether the statement was accompanied by outward signs of excitement or emotional distress, and (4) the choice of words employed by the declarant to describe the experience."  ***Id.*** (citing ***Canape v. Peterson***, 878 P.2d 83, 87 (Colo. App. 1994), ***aff'd***, 897 P.2d 762 (Colo. 1995)).

According to Neal's and Lear's testimony at the suppression hearing, L.G. stated that during the weekend of March 1 through March 3, 2003, Self beat L.G., kicked and punched her pregnant stomach, held a gun to her head, and threatened to kill her and Neal.

At a pretrial conference following the suppression hearing, the prosecution argued for the introduction of numerous statements by L.G.

The trial court ruled that the statements L.G. made to Neal and Lear in the days following the weekend described above were admissible at trial.  The court relied upon the *Hulsing* division's liberal interpretation of the temporal requirement between the startling event and the victim's statements to conclude that the excited utterance hearsay exception applied.  Specifically, the court found that "being beat up while pregnant would be an intense experience," and, accordingly, such an experience warranted the admission of statements made up to four days after L.G. escaped from Self's house.  We review each set of statements in turn.

The first statements at issue were made by L.G. to her mother at a soup kitchen, where Neal volunteered, shortly after L.G. left Self's house on Monday, March 3, 2003.  Neal testified that she immediately noticed bruises all over L.G.'s face.  Then L.G. asked Neal and one of Neal's fellow volunteers to follow her inside; there, she showed them her bruised pregnant stomach, explaining that Self had kicked and punched her.  L.G. further stated that she wanted someone other than her mother to see the bruises on her stomach because Self had threatened to kill both her and her mother.  Neal testified that the bruises were fresh.

Here, we cannot say that the court abused its discretion in admitting L.G.'s statements to her mother on Monday, March 3, 2003 under the excited utterance hearsay exception.  The trial court found, based upon Neal's and her fellow volunteer's testimony, that L.G., was very upset, distraught, hysterical, crying, and scared.  Although the record does not clearly indicate how much time passed between when L.G. left Self's house and when she spoke to her mother at the soup kitchen, the record supports the trial court's conclusion that L.G. was still under the stress of the event when she made the statements.

The second statements at issue were made by L.G. to her other boyfriend, Lear, during the evening of Sunday, March 2 or the evening of Monday, March 3.  (At the suppression hearing, Lear testified that this encounter occurred on Sunday, March 2.  However, at trial, Lear testified that this encounter occurred on Monday, March 3, after L.G. and her mother returned home from the soup kitchen.)  Lear testified that, when he arrived at Neal's house, L.G. was lying on the couch, lethargic.  He observed that she had bruises on her face, arms, and chest, and all around her pregnant stomach.  When they discussed her bruises, L.G. became upset and scared.  L.G. told Lear that Self had beaten her, kicked her in the stomach several times, and threatened to kill her.  Specifically, L.G. told Lear that while Self kicked her pregnant stomach, he said, "You don't want the baby, nobody wants this baby and so why don't I get rid of it for you?"  Additionally, Lear testified that L.G. told him that she was at

Self's house for about three days or so until he finally fell asleep and she was able to escape.

The third statements at issue were made by L.G. to Neal on Tuesday, March 4, 2003, while L.G. accompanied Neal to the grocery store.  L.G. told Neal that she had to call Self because he would kill her if she did not call him every day.  Neal testified that L.G. was upset, scared, and fearful.

Finally, the last statements at issue were statements L.G. made to Neal on Thursday, March 6, 2003.  Neal testified that L.G. was scared of Self; he had held a gun to her head, ordering her to perform oral sex on him; and he had threatened to kill her if she did not stay in touch with him daily.  Neal further testified that L.G. told her that Self had said one of his fantasies was to kill L.G., and if L.G. told anyone, he would kill Neal.  Additionally, Neal said that L.G. told her that Self claimed he would shoot her in the head and make it look like a suicide.

If, as Lear testified at the suppression hearing, L.G. made the statements to Lear on Sunday, March 2, they were excited utterances, as L.G. would have made them immediately after she left defendant's house and while she was under the stress of the event.  If L.G. made those statements on Monday, March 3, however, they might not qualify as excited utterances.  We need not decide the date on which L.G. made those statements, because we conclude that even if L.G. made them on March 3, and they were not excited utterances, they were cumulative of the properly admitted excited utterances L.G. made to Neal at the soup kitchen on Monday.  Likewise, even if we assume the statements L.G. made to Neal the following Tuesday and Thursday were not excited utterances, we conclude that they were cumulative of the properly admitted excited utterances L.G. made to Neal at the soup kitchen on Monday.  The other statements to Lear and Neal simply provided further details about Self's threats and violence to L.G.  Furthermore, the jury was already aware, based upon properly admitted evidence, that according to L.G., Self had subjected her to severe domestic violence.

Based upon the overwhelming evidence against Self discussed in part VIII below and the limiting instruction the trial court gave before the introduction of each of L.G.'s statements, we are confident beyond a reasonable doubt that Self was not prejudiced by any error in admitting the other statements.  **See Herrera**, 87 P.3d at 251 ("reversal is required unless the court is confident beyond a reasonable doubt that the defendant was not prejudiced by the error").

B.  Confrontation Clause

Self also contends the trial court violated his constitutional right to confront the witnesses against him, specifically L.G.  We are not persuaded.

Until the United States Supreme Court announced *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), in 2004, the constitutional admissibility of hearsay statements was determined based upon the two-prong test articulated in *Roberts*, 448 U.S. 56, 100 S. Ct. 2531.  Under the *Roberts* test, a court could admit statements made by a declarant who did not testify if the prosecution showed that (1) the declarant was unavailable and (2) the statements were reliable, either because they fell within a "firmly rooted" hearsay exception or because they bore "particularized guarantees of trustworthiness." *Id.* at 66, 100 S. Ct. at 2539.

In *Crawford*, the Supreme Court distinguished between testimonial and nontestimonial hearsay statements, abrogated *Roberts* with respect to testimonial hearsay statements, and adopted a new test for determining whether the admission of testimonial hearsay violates a defendant's federal constitutional right to confront witnesses against him or her.  *See Compan*, 100 P.3d at 537.  The Court held that testimonial statements of witnesses absent from trial are admissible only if the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant.  *Crawford*, 541 U.S. at 59, 124 S. Ct. at 1369.

With respect to nontestimonial hearsay, although the Supreme Court explained that the admissibility of such statements is a matter left to the states, *id.* at 68, 124 S. Ct. 1374 ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . ."), the majority of courts considering the issue have concluded that *Roberts* continues to govern federal constitutional scrutiny of nontestimonial hearsay statements. *Compan*, 121 P.3d at 881.

Similarly, the Colorado Supreme Court has concluded that Colorado's Confrontation Clause prohibits the admission of nontestimonial hearsay statements unless the *Roberts-Dement* test is satisfied.  *See id.* at 880 (noting that in *People v. Dement*, 661 P.2d at 680-81, the supreme court adopted the *Roberts* two-part test, articulated above, to determine the admissibility of hearsay evidence under Colorado's Constitution).

24

Here, the trial court concluded, and we agree, that L.G.'s hearsay statements admitted at trial were nontestimonial because the statements were made to her mother, Carla Neal, and her other boyfriend, Philip Lear. Accordingly, L.G.'s hearsay statements must be analyzed under the ***Roberts-Dement*** test.

Both prongs of the test are satisfied. First, the declarant, L.G., was unavailable because she was dead. Second, the trial court admitted some of L.G.'s statements based upon the excited utterance hearsay exception, which is firmly rooted hearsay exception. ***See Compan***, 121 P.3d at 880. Consequently, the trial court did not violate Self's right to confront the witnesses against him.

***Self***, No. 04CA1542 at 5-17.

The United States and Colorado Constitutions provide criminal defendants the right to confront the witnesses against them. *See* U.S. Const. amend. VI; Colo. Const. art. II, § 16. The Sixth Amendment right of confrontation guaranteed by the United States Constitution is a fundamental right and is applicable to the states through the Fourteenth Amendment. ***Pointer v. Texas***, 380 U.S. 400, 403 (1965). Admission of hearsay evidence implicates the constitutional right of the defendant to confront witnesses against him. ***Blecha v. People***, 962 P.2d 931 (Colo. 1998). Moreover, a challenge to hearsay evidence based on the Confrontation Clause requires a case-by-case analysis. ***People v. Oliver***, 745 P.2d 222, 226 (Colo. 1987).

A defendant's right to confront an opposing witness is guaranteed by the Sixth Amendment. ***Stevens v. Ortiz***, 465 F.3d 1229, 1235 (10th Cir. 2006), ***cert. denied***, 549 U.S. 1281 (2007). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." ***Maryland v. Craig***, 497 U.S. 836, 845 (1990). "[A]n out-of-court statement that falls within an

25

exception to a hearsay rule under a state's evidentiary rules must nonetheless be excluded from a defendant's trial if its admission would deprive him of his constitutional right of confrontation." *See Stevens*, 465 F.3d at 1236 (citing *Dutton v. Evans*, 400 U.S. 74, 80-82 (1970)).

Applicant's trial took place in June 2004.  Previously, on March 8, 2004, the U.S. Supreme Court decided *Crawford*.  Prior to *Crawford*, the admissibility of hearsay statements under the Confrontation Clause was governed by the *Roberts* two-part test. Under the *Roberts* test, the prosecution must first prove that the witness is unavailable, and then the out-of-court statements may be introduced at trial if they bear adequate "indicia of reliability."  In *Crawford*, the Supreme Court abrogated the second part of the *Roberts* test, but left the first part intact.  The Supreme Court tightened the analysis of Confrontation Clause claims by limiting the admissibility of testimonial hearsay.

In *People v. Fry*, 92 P.3d 970 (Colo. 2004), the Colorado Supreme Court incorporated the *Crawford* analysis.  In *Davis v. Washington*, 547 U.S. 813 (2006), the Supreme Court recognized that statements are testimonial when the circumstances of a police interrogation "objectively indicate that there is no . . . ongoing emergency, and that the primary purpose . . .  is to establish or prove past events potentially relevant to later criminal prosecution."  *Davis*, 547 U.S. at 822.

The statements at issue here, nonetheless, are nontestimonial.  Each of the statements were made either to L.G.'s mother or to other acquaintances.  Under *Davis*, the Confrontation Clause would not apply.  *Id.*  The admission of a hearsay statement does not violate the Confrontation Clause if the declarant was unavailable to testify and the statement bore "adequate indicia of reliability."  *Roberts*, 448 U.S. at 66 (internal

26

quotation marks omitted).  The reliability of a hearsay statement is inferred from the fact

that the statement falls "within a firmly rooted hearsay exception" or by a "showing of

particularized guarantees of trustworthiness."  *Id.*

Excited utterances withstand confrontation clause challenges.  *See Idaho v.*

*Wright*, 497 U.S. 805 (1990).

> The basis for the 'excited utterance' exception for example, is that such
> statements are given under circumstances that eliminate the possibility of
> fabrication, coaching, or confabulation, and that therefore the
> circumstances surrounding the making of the statement provide sufficient
> assurance that the statement is trustworthy and that cross-examination
> would be superfluous.

*Id.* at 820.  Based on their historical efficacy and inherent guarantees of trustworthiness,

"excited utterances, as defined by Colo. R. Evid. 803(2), are firmly rooted and have the

'solid foundation' to which the Supreme Court in *Ohio v. Roberts*

[ ] referred as permitting an inference of reliability."  *See Mitchell v. Watkins*, 252 F.

App'x 874, 879 (10th Cir. 2007).

Assuming, however, that L.G.'s statements did not qualify as excited

utterances, "[I] look to whether the prejudicial impact of constitutional error in [the]

state-court criminal trial rises to the substantial and injurious effect standard set forth in

*Brecht v. Abrahamson*, 507 U.S. 619 (1993), and *O'Neal v. McAninch*, 513 U.S. 432

(1995).  *Welch v. Workman*, 639 F.3d 980, 992 (10th Cir. 2011) (citing *Fry v. Pliler*,

551 U.S. 112, 121 (2007) (internal quotation marks omitted).  Under *Brecht/McAninch*,

there is a plenary review to determine if a trial error "resulted in actual prejudice."  *See*

*Brecht*, 507 U.S. at 637 (internal quotation marks and citation omitted).  I make this

harmless error determination based upon a review of the entire state court record. ***See***

***Herrera v. Lemaster***, 225 F.3d 1176, 1179 (10th Cir. 2000).

As stated under Claim Three, a review of the state court record shows

Applicant's guilt was overwhelmingly supported by other evidence. Therefore, I find no

prejudicial impact of constitutional error that rises to the level of a substantial and

injurious effect under ***Brecht***. The CCA decision set forth above did not result in a

decision that was contrary to, or involve an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States and

did not result in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the state court proceeding. Claim Four lacks

merit and will be dismissed.

E. Claim Five

In Claim Five, Applicant alleges that the trial court erred in admitting statements

made in violation of ***Miranda***.[6] Respondents assert that prior to trial Applicant moved to

suppress the following statements: (1) his on-the-scene statements made while

standing in the front yard of his house and his statements made after he was

handcuffed at his house; and (2) the statements he made on his way to and at the

police station. In his Traverse, Applicant further alleges that he was questioned,

handcuffed, and questioned more without being ***Mirandized***. He further alleges that he

was transported in a police car to one police station where he was questioned further in

a small, closed interview room and that he again was transported to another police

---

[6] "***Miranda***" and *"**Mirandized**"* are examples of some of the many common shorthand references to the advisement of rights required by the Supreme Court in the seminal case of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

station, where he was questioned in a small, closed interview room, **Mirandized**, and

subsequently interrogated for three hours in violation of his rights pursuant to **Brown v.**

**Illinois**, 422 U.S. 590 (1975).  Applicant contends that the police may not avoid

**Miranda** by engaging in a strategy of question, advise, and question again under

**Missouri v. Seibert**, 542 U.S. 600, 611-14 (2004).[7]

With respect to Claim Five, the CCA found as follows:

### IV.  Custodial Interrogation

Self contends the trial court erred in admitting his statements to police after the incident because he was in custody when the police questioned him without first advising him of his **Miranda** rights.  We conclude (1) Self made numerous voluntary statements before he was in custody and (2) although Self made several statements after he was handcuffed (and was, therefore, in custody), the admission of those statements was harmless error.

Custody is determined from the totality of the circumstances surrounding a defendant's encounter with law enforcement.  We review the trial court's legal conclusion de novo.  We defer to the trial court's factual findings.  **People v. Stephenson**, 159 O.3d 617, 620 (Colo. 2007).

If we conclude the trial court erred in denying a motion to suppress statements, we must determine whether the error was harmless beyond a reasonable doubt.  **Raile v. People**, 148 P.3d 126, 133 (Colo. 2006).

Statements that are a product of custodial interrogation are inadmissible in the People's case-in-chief unless the defendant is warned of his or her rights.  **Miranda v. Arizona**, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); **see** U.S. Const. amend. V. A defendant is in custody if "a reasonable person in the defendant's position would consider himself [or herself] to be deprived of his [or her] freedom of action to the degree associated with a formal arrest."  **People v. Pascual**, 111 P.3d

---

[7]  In the Traverse, Applicant seeks to incorporate all the arguments he asserted on pages 22-23 in his opening brief on direct appeal in state court.  I need not address claims raised for the first time in a reply brief.  **See United States v. Mora**, 293 F.3d 1213, 1216 (10th Cir., 2002).  Also, as stated above in Footnote 4, it is not a judicial function to assist Applicant in stating the factual support for his claim.  **Hall**, 935 F.2d at 1110.  To the extent, however, the factual allegation in the opening brief supports Claim Five, I will consider the allegations.

471, 476 (Colo. 2005) (quoting *People v. Matheny*, 46 P.3d 453, 468 (Colo. 2002)).  However, a *Miranda* advisement is not required when the defendant is not in custody.  *See Stephenson*, 159 P.3d at 621-22.

A number of factors are relevant to determine whether a defendant is in custody, including:

> the time, place, and purpose of the encounter; who is present during the interrogation; what the officer says to the defendant; the officer's tone of voice and general demeanor; the length and mood of the interrogation; whether the defendant's movement is limited during the interrogation; the officer's response to any questions asked by the defendant; whether directions were given to the defendant during the interrogation; and the defendant's verbal and nonverbal response to such directions.

*Pascual*, 111 P.3d at 476.  However, use of handcuffs is traditionally associated with arrest, and courts are more likely to find a defendant is in custody when handcuffs are used.  *People v. Polander*, 41 P.3d 698, 705 (Colo. 2001); 1 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 6.6(c), at 556 (2d ed. 1999); *see also People v. Mangum*, 48 P.3d 568, 572 (Colo. 2002) (although not dispositive, use of handcuffs suggests custody).

Here, Officer Reed introduced himself to Self at his home and asked Self what had happened.  Self stated his name and told the officer that the victim had taken his truck and he had returned home recently.  Self stated that the victim had shot herself.  Officer Reed observed that the gun was sitting on the nightstand and asked Self if he had moved the gun.  Self responded that he had not.

Officer Blanscet arrived on the scene and also asked Self several questions.  Self stated that his girlfriend had been attending a methadone clinic, that she was a heavy heroin addict, and that she was seven months pregnant by a different man.  Self stated that she would go to the other man's house and would spend time there before returning to Self's house and that he was very upset about this behavior.

He also stated in response to questions that when he found his girlfriend's body he wanted to help her but he did not assist her medically.  He said he did not move anything in the apartment before he called 911.  At one point Self stated that fifteen minutes after returning home he called 911.  Later, he stated that he was home for one to two hours before calling

911.  When Officer Blanscet confronted him with this apparent discrepancy, he did not respond and looked at the ground.

Officers Reed and Blanscet then decided they should preserve any GSR on Self's hands and, with Self's permission, placed paper bags over his hands. Officers Reed and Blanscet testified that they did not have any evidence tape and therefore used handcuffs to secure the bags.  Officer Reed conceded that Self was concerned about having his hands bagged.  They told Self several times that he was not in custody, but that they needed to preserve evidence of GSR and that it could work in his favor if it showed there was no residue on his hands.

Officer Reed transported Self to the police substation where he was interviewed by Officer Blanscet for another thirty to forty-five minutes.  During this interview, Self again stated that he was upset with his girlfriend because she would disappear for days at a time.  He also stated that he was recently diagnosed as bipolar and that he did not have his prescription filled yet.  He stated that the victim pleased him sexually.  He reiterated that the victim was a heroin addict and cocaine user.  None of the officers advised Self of his *Miranda* rights prior to or during any of these interactions.

At his home, Self initially volunteered numerous statements, was relaxed, and was smoking a cigarette.  Self initiated contact with authorities by calling 911, to which a reasonable person would expect both paramedics and police would respond.  However, when Self was handcuffed, the interaction with police changed.  At least one, and up to three, officers stood next to Self as they questioned him on the porch.  Self was forced to stop smoking when police decided to handcuff him.  Although police testified they handcuffed Self's hands in front of his body as opposed to behind his back because he was not in custody, a reasonable person who is not a law enforcement officer would not likely recognize the distinction.  *Pascual*, 111 P.3d at 476.  Self was taken to the police substation and was questioned for thirty to forty-five minutes.  The bags were still on Self's hands, but the officers could not remember when or if they removed the handcuffs at this time.  Police told Self that he needed to talk to a detective and to have his hands tested for GSR.

Considering all these factors, we agree with Self's contention that he was in custody when the officers handcuffed him.  However, after Self was in custody, he largely repeated statements he had made prior to custodial interrogation.  Self did not state prior to being handcuffed that his girlfriend pleased him sexually, but the admission of this statement was harmless error.  Self had already told the 911 operator that the victim had another boyfriend, and a fellow inmate testified that Self called the victim a

whore.  Therefore, the introduction of statements made to police after he was handcuffed was not significant and constituted harmless error beyond a reasonable doubt.

*Self*, No. 04CA1542 at 23-29.

A suspect is in the "custody" of police when he is "deprived of his freedom of action in any significant way or his freedom of action is curtailed to a degree associated with formal arrest." *United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008) (internal quotation marks and citations omitted).  Stated another way, the question is whether, under the totality of the circumstances, "a reasonable [person] in the suspect's position would have understood [the] situation . . . ; as the functional equivalent of formal arrest." *Id.* (internal quotation marks and citation omitted).

To be admissible under the Due Process Clause of the Fourteenth Amendment, a defendant's statements to police must have been "made freely, voluntarily and without compulsion or inducement of any sort." *Nickel v. Hannigan*, 97 F.3d 403, 410 (10th Cir. 1996) (citing *Haynes v. State of Wash.*, 373 U.S. 503, 513 (1963)).  "[T]o conclude that a confession is involuntary under the Due Process Clause of the Fourteenth Amendment, [the court] must find that it was the result of 'coercive police activity.' " *Id.* (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).

Voluntariness is determined in view of the totality of the circumstances. *Nickel*, 97 F.3d at 410 (citing *Haynes*, 373 U.S. at 513)).  I must determine whether (1) the waiver was "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and (2) the waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  Again, the "totality of the

circumstances" must reveal a voluntary waiver.  *Id.* (citing ***Fare v. Michael C.***, 442 U.S. 707, 725 (1979)) (internal quotation marks omitted).

The state court transcript for the suppression hearing sets forth the trial court's findings as follows:

> THE COURT:     Turning now to the motion to suppress statements, again, the matter came on for hearing pursuant to that motion.  There were three separate statements that were made.  Those statements to Officer Reed, Officer Blanscet, and finally the video statement made to Detective Bjorndahl.

> In general, statements obtained as a result [of] custodial interrogation may not be used against the Defendant unless, prior to questioning, the Defendant was given ***Miranda*** rights.  That comes from ***Jones v. People***, 711 P.2d 1270.

> We first look at the statements made to Officer Reed and Blanscet. There's no question that ***Miranda*** rights were not given.  There was no need to give ***Miranda*** because the Defendant was not in custody.  The totality of the circumstances show he was not in custody.  For example, it was the Defendant who called 911.  The conversation took place in his backyard.  The Defendant was not under arrest.  No one prevented him from leaving, even though the officers were watching him.  Him being taken to the police station was for the purposes of GSR testing and, indeed, this is why the bags were put on his hands and handcuffs were use to prevent the bags from coming off.  He was told numerous times that he was not in custody.  There were no weapons displayed.  There was no physical touching of the Defendant other than putting on the handcuffs.

> Custody is not limited to those situations where a formal arrest has taken place but also includes those situations where the person interrogated has been significantly deprived of his freedom of action.  In the case at bar, the fact that they were trying to get information from the Defendant concerning his call does not rise to the level of custody. Indeed, even after the Defendant was taken to the police station, he was released.  The Court has also looked at the words spoken by the officers, and none of those words indicate custody.  Also, the demeanor of the officers was in a conversational tone, not any type of threats.

> There was also testimony that the Defendant's demeanor was non-emotional, casual, very nonchalant.  Defendant's body language was

calm.  The length of these two question periods was not longer than two to three minutes with Reed.  The Sand Creek interview was approximately 30 minutes.  So those are interviews that are relatively short.  Therefore, as to both Reed and Blanscet, those interviews the Court finds the Defendant was not in custody.  Therefore, the Court will deny that motion.

Turning next to the issue of voluntariness as to those interviews, the Court finds that the Defendant made the statements voluntarily.  The totality of the circumstances reveal the voluntary nature of the Defendant's statements.

Those circumstances are: One, that the Defendant made the initial call; two, the statements to Reed were in the yard; three, Officer Reed was merely in the investigative stage of his job; four, the Defendant's demeanor was not emotional, casual, very nonchalant; five, the Defendant was asked what he saw, not what did you do.  Defendant was asked what happened and he was not confronted.  The Defendant's body language was calm.  There was a short conversation with Reed.  Officers did not advise the Defendant that they were suspicious of him, thus putting extra pressure on him.  The Defendant was never told he was under arrest.  They told the Defendant they were just trying to preserve evidence.  There was no coercion, no threats.

The Court has also relied on *People v. Lawrence*, 55 P.3d 155.  A reasonable person in the suspect's position would not consider himself deprived of his freedom of action in any significant way at the time of the questioning.  That's the standard that the Court must look at[ ] [a]nd *People v. Baird*, 66 P.3d 183.  On-the-scene investigation or questioning that enables an officer to determine what has happened and who has been injured is not an interrogation under *Miranda*.

Concerning the voluntariness of the statement to Officer Blanscet, the totality of those circumstances show it also was voluntary.  We have, again, part of the statement in the yard, the lawn chair.  The Defendant was calm.  The officer's demeanor was calm.  Blanscet said he was calm, especially because he said the Defendant was bipolar.  He was told the bags were there to preserve evidence.  He was handcuffed, but it was put in front using two instead of one and not in the back.  He was told he is not in custody.

At Sand Creek, the Defendant was laughing and joking.  No weapons were displayed.  At some point the Defendant was smoking a cigarette and his demeanor didn't change.  There were no threats, and it also goes without saying the Defendant knew why he was at the police station and why they were asking questions.  The fact that the Defendant

may have been bipolar or is bipolar and that he was cuffed with bags and he was taken to the station to be given the GSR was considered by the Court, but these factors did not make his statements involuntary.  The totality of the circumstances show his statements to Reed and Blanscet were voluntary.  The Government's conduct did not play a significant role in inducing the Defendant's statement.

The Court has reviewed *People v. Medina*, 25 P.3d 1222; *People v. Olivas*, 41 P.3d 658.  Therefore, the Court will deny the motion to suppress these statements finding voluntariness and no custody. . . .

THE COURT:     Finally, concerning the statements made to Detective Bjorndahl, the Court must determine whether or not the Defendant's statements were made after there was a request for a lawyer, or was there a request for a lawyer.  The Court has reviewed the cases cited by both counsel and has also reviewed the case of *People v. Arroya*, 988 P.2d 1124.  Although the *Arroya* case dealt with a Defendant's right to remain silent, there is language in that opinion that is relevant to the case at bar.

*Arroya* contains language which states: In the right to counsel context, the Supreme Court instituted a clear, articulate rule to trigger the safeguards envisioned by the *Miranda* right to counsel.  If a suspect clearly requests an attorney, then no further questioning may occur until an attorney has been made available or the suspect reinitiates the conversation.  However, if the suspect's request is ambiguous, then police need not make an effort to clarify the statement and are free to continue to question.  To determine whether a suspect clearly invoked his constitutional right to an attorney, the Supreme Court employed the objective standard of a reasonable police officer under the circumstances.

*Arroya* goes on to state that the Court must again look at the totality of the circumstances to assess how a reasonable officer in the circumstances would perceive a statement that might be a request for the assistance of counsel.

The Court has also reviewed *People v. Romero*, 953 P.2d 550, which is cited in *Arroyo*; and in *People v. Romero*, the appellate court found the statement, "I should talk to a lawyer because I do not want to go to trial on this." to be a clear request for counsel given the surrounding circumstances.

I've also reviewed *People v. Talley*, 7 P.3d 172.  Also, *Arroyo* cites *People v. Kleber*, 859 P.2d 1361, which states that:  Further, because the suspects may have only limited skills for verbalizing their

wishes in a custodial setting, a court must give a broad rather than narrow interpretation to requests to cut off questioning.  Also, **Romero** directs courts to interpret requests for counsel broadly.

The Court has also reviewed various cases that stand for the proposition that a suspect's request for counsel is not irrevocable.  A suspect may later rescind the decision if he initiated further communication.  **People v. Martinez**, 789 P.2d 420.

With these cases in minds [sic], the Court turns to the totality of the circumstances and the objective standard that is required of officers in Detective Bjorndahl's position.  The Court has reviewed the video in its entirety.

In the case at bar, there were two separate statements concerning attorneys, the first statement at 8:02 and the next at 10:08.  Turning first to the statement at 8:02, the Defendant was initially brought in at 7:30 and approximately one-half hour was used to get the GSR testing, and the Defendant was then given a smoke break.  At 8:02 the Defendant advised that he was going to be given -- at 8:02 the Defendant was advised that he was going to be given his **Miranda** rights and the Defendants says, "Do I need an attorney?"  Bjorndahl answers, "That is up to you.  I cannot advise you.  As far as I know, you don't."

Defendant then says, "How can I answer questions if you're advising me of rights?"  There's a knock on the door.  Bjorndahl leaves, then comes back at 8:06.  The Defendant then says -- this is a response from watching TV -- "Okay, like I said, I'm watching too much TV."

**Miranda** was actually read at 8:07.  Defendant then asked, "How long to get an attorney?"  Bjorndahl responds he doesn't know.  Defendant then says, "Can I plead the fifth?"  Bjorndahl responds, "You can, but that is usually for someone who is charged."  Defendant then says, "I want to tell you exactly what happened.  Let's do this."

The Court finds that this colloquy between the detective and the Defendant was not a clear request for an attorney.  It was ambiguous.  The statements made by the Defendant were not requests for an attorney but were questions.  The plain language of "do I need an attorney" is a question and not a request for an attorney.  Defendant then immediately follows this up with a response that, "This comes from watching too much television."  Again, this is not a request but an explanation.

"How long to get an attorney," again, is not a request but a question.  "Can I plead the fifth" is also a question, not a request.

36

I have taken into consideration the answers given by the detective in response to the questions asked by the Defendant but do not find those answers to be misleading or overbearing the Defendant's will. These statements made by this Defendant are certainly different than statements like "I should get an attorney, I want a lawyer," or "I should talk to a lawyer."

The Court, in looking at the totality of the circumstances concerning this first statement notes that the conversation took place at the beginning of the session; and the demeanor of the Defendant was calm and the conversation was in a normal. everyday tone. The Defendant had just been offered a coffee and was given a soda and had just finished a cigarette break. In addition, prior to really being questioned at approximately 7:55, the Defendant says, "I will try to help." Also, the Court notes that Bjorndahl's demeanor was calm and not coercive.

The next time there was a statement concerning an attorney was at approximately 10:08 when the Defendant was asked, "Did you shoot her?" Defendant states, "Okay I want an attorney." Then he immediately says, "No, I don't." There wasn't even a pause. It was then, "No, I don't."

Bjorndahl leaves the room for approximately 17 minutes. When he comes back, he asks the Defendant about counsel and the Defendant says, "No." Bjorndahl explains why he needs to ask him about the attorney issue. Defendant then says, "I'm exhausted, but I want to cooperate."

I have taken into consideration that at this point, the Defendant has been at the police station for approximately a little under three hours; but this in and of itself does not mean the Defendant's will was overborne by government action. Had the Defendant said, "Okay, I want an attorney" and then said no more, that would be a clear request for an attorney. The Defendant did not do that. Instead, he says, "No, I don't," and then proceeds after a break in questioning to say he will cooperate. Again, this is not a clear request for an attorney.

The Court notes that here Bjorndahl's demeanor is still calm and although Defendant says he is exhausted, he still is willing to talk. He is certainly--the Court looks at the demeanor and notes that he is certainly more annoyed at this stage of the questioning but he still is alert and answering questions . Again, his will is not overborne. Thus in looking at this colloquy, the Court finds that it was not a clear request for an attorney.

The court has considered the Defendant's argument that although the interview may have started consensual, at some point his will was

37

overborne and it was no longer voluntary.  The Court, in looking at the totality of the circumstances, rejects this argument and finds that the interview and statements made were voluntary.  The fact that Bjorndahl may have minimized the seriousness of the interview, that at one point the Defendant was handcuffed and that the interview was at the police station, does not in this particular situation make the statement involuntary.  The totality of the circumstances reveals the opposite.

The totality of the circumstances reveals the following:  One, the Defendant at the beginning of the interview was given a coke.  Two, the Defendant at the beginning of the interview was given a cigarette break.  Three, the Defendant was given tissue to blow his nose.  Four, if the Defendant was crying, it is hard to tell if this is so.  If it was so that he was crying, it certainly was not a strong, uncontrollable cry.  Five, the Defendant more than once says he will help.  Six, the demeanor of both participants was calm.  Detective Bjorndahl was not coercive.  The Defendant's demeanor at most had brief periods of anger, but he seemed more annoyed than angry.

Again, it was a conversational tone.  The Defendant's demeanor at times was more bored than angry.  There were no weapons displayed.  The detective was not in uniform but plain clothes.  There were only two people in the room, the Defendant and the detective.  Thus, it was not a good cop, bad cop type of interview where they were trying to use that to influence statement or get statements.  Although the Defendant at time said he was exhausted, he was given breaks.  He was allowed to stand and at one point he did some knee bends and was allowed to stretch.

And that although the video starts at 7:30 and does not end until 11:25 when the Defendant was given a ride home, it was not a continuous four-hour interview.  The actual questions do not start until 8:02.  There's a 10-minute break at 8:35.  There's a 13-minute break at 9:03.  There's a 20-minute break at 9:32.  There's a 7-minute break at 10:10.  And, finally from 10:24 to the end of the interview, the Defendant is either smoking or eating lunch in the interview room.

Based upon the totality of the circumstances, the Court finds that the Defendant's statements were knowing, voluntary, and intelligently given.  There were brief comments about the Defendant being bipolar and needing medications.  However, the Defendant was answering questions in an appropriate manner and was making sense in regard to his response.

The Court also notes that at approximately 10:06 of the interview, the Defendant asks, "Can we continue at another time?"  But, again, this is

a question and not a request to stop the interview or request to invoke his right to silence.  Therefore, the Court is denying in its entirety the Defendant's motion to suppress the statement made in the video.

Oct. 9, 2003 Hr'g at 5-15.

Applicant has the burden of rebutting with clear and convincing evidence the presumption that the state court's factual determinations are correct.  Although Applicant fails to identify in the Application or in the Traverse any involuntary statements he made to the police, in violation of his rights under *Miranda*, that should have been suppressed, he does refer to his direct appeal regarding this issue.  In the direct appeal, Applicant identifies several statements that were prejudicial to his defense, including (1) Officer Reed testified at trial that Applicant was unemotional, denied touching the gun, and referred to L.G. as a whore, Pre-Answer Resp., App. A at  38; and (2) Officer Blanscet testified that Applicant was calm, unemotional, did not seem upset, was "thinking about the answers" he gave, contradicted himself on how long he waited to call 911, stated he did not touch the gun and he did not do anything medically to assist L.G., would not identify the individuals he was with prior to finding L.G., stated L.G. was an addict and had another boyfriend which bothered or upset him, L.G. was good in bed and he enjoyed her blow jobs, but he did not inquire about her condition, spoke of her as in the past tense, and never expressed sadness or shock about the alleged suicide. *Id.* at 38-39.

In the opening brief on direct appeal, Applicant stated that he did not believe he was free to leave the scene of the crime because there were three armed, uniformed officers on the scene, including Reed and Blanscet, and Reed instructed Blanscet to watch Applicant to make sure he did not leave.  *Id.* at 32.  Applicant also stated in the

brief that while officers testified they told him he was not in custody they did not tell him he was free to go.  *Id.*

Applicant was in the yard of his home when Officers Reed and Blanscet first spoke with him prior to placing the bags on his hands.  Officer Reed testified at the motions hearing that when he arrived at the scene Applicant was sitting in a lawn chair outside of his house, which is where the shooting had taken place.  Sept. 25, 2003 Hr'g at 95.  He further testified that he directed an officer to go inside and take pictures while he talked with Applicant.  *Id.* at 96.  Officer Reed also testified that he asked Applicant direct questions, he would give short answers and then would ramble about other unrelated issues, but he did not change his demeanor and remained calm and nonchalant during the questioning.  *Id.* at 97-98.  Officer Reed also testified that after going into the house and examining the scene he returned outside to where Applicant remained sitting and smoking a cigarette and asked Applicant if he had touched the handgun to which he responded that he had not.  *Id.* at 100.  Based on the emotional state of Applicant, placement of the gun on a table by the bed, and Applicant's response that he had not touched the gun, Officer Reed ordered Officer Blanscet to bag Applicant's hands so that if there was any gun residue on his hands he would not be able to get rid of the evidence.  *Id.* at 101.  Officer Reed also testified that he explained to Applicant at this time that he was not under arrest because they were bagging his hands.  *Id.* at 103.

Officer Blanscet testified that he entered the yard and began to talk with Applicant along with Officer Reed about what happened.  *Id.*  Officer Blanscet further testified that Applicant stated (1) L.G. had left early the morning prior to the incident to

go to the methadone clinic (indicated she was a heavy heroin addict) and at 1:00 a.m. on the day of the incident he went with friends to locate her; (2) she was seven to eight months pregnant by a different individual with who she spent time; and (3) he returned to the scene and found his girlfriend in the house.  *Id.* at 118.  Officer Blanscet also testified that Applicant maintained a calm demeanor, responded to questions and volunteered information, and stated that he did not perform any medical assistance on her, had not touched anything, including the gun, and called 911.  *Id.* at 118-19.  Officer Blanscet further testified that Applicant continued to talk about L.G.'s heroin addiction and her relationship with another man, which he was upset about.  He also testified that Applicant denied touching the gun and gave inconsistent statements during the course of the conversation about how long he waited to call 911.  *Id.* at 119-20.  Finally, Officer Blanscet testified that due to the inconsistencies in Applicant's statements he and Officer Reed decided to bag his hands until a gun residue test could be performed.  *Id.* at 122.

Nothing regarding the conversations between Officers Reed and Blanscet prior to the bagging of Applicant's hands would have led Applicant to believe he was in custody or deprived of his freedom of action in any significant way or his freedom of action was curtailed to a degree associated with formal arrest.  The statements he made to Officers Reed and Blanscet were voluntary and admitting these statements did not violate *Miranda*.

As for the statements made after Applicant's hands were bagged, but before he was interviewed at the police station, I find the trial court set forth sufficient evidence for finding a *Miranda* warning was not required, and the statements were voluntary.  As for

41

the statements made once Applicant was subject to continuing questioning at the police station, there is basis for finding that Applicant may have believed he was in custody and a ***Miranda*** warning should have been given sooner during the interview.

Nonetheless, even if the CCA was correct in finding that the trial court erred in admitting all of Applicant's statements made after his hands first were bagged and handcuffed, the error, as also found by the CCA, was rendered harmless beyond a reasonable doubt by the overwhelming evidence of Applicant's guilt. ***See People v. Wilson***, 709 P.2d 29 (Colo. App. 1985) (inculpatory statement obtained in violation of ***Miranda*** was harmless error due to abundant evidence of defendant's guilt). As stated above under the discussion on Claim Three on Page 18, there was overwhelming evidence of Applicant's guilt.

"A federal court reviewing a state court determination in a habeas proceeding should not grant relief unless the court finds the trial error 'had substantial and injurious effect or influence in determining the jury's verdict.' " ***Crespin v. State of New Mexico***, 144 F.3d 641, 649 (10th Cir. 1998) (quoting ***Brecht***, 507 U.S. at 637). "To obtain relief for the error, the habeas petitioner must 'establish that it resulted in actual prejudice.' " ***Id.*** (quoting ***Brecht***, 507 U.S. at 637). The applicant bears the burden of establishing actual prejudice. ***Id.*** Applicant has failed to do so.

Furthermore, the statements Applicant challenged in his direct appeal were made prior to his hands being bagged. To the extent these statements were repeated after his hands were bagged and he was taken to the police station, they are cumulative. The jury, therefore, was apprised of the statements based on properly admissible evidence.

42

I find that the CCA decision set forth above did not result in a decision that was contrary to, or involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Claim Five lacks merit and will be dismissed.

F.  Claim Six

In Claim Six, Applicant alleges that the CCA erred in invoking exceptions to the warrant requirement that were not argued by the prosecution or determined by the trial court.  Applicant further asserts that he was denied a full and fair opportunity to litigate his Fourth Amendment claim in state court and on appeal.  In the June 15, 2011 Order, I found that this claim, in essence, is a challenge to the validity of the search warrant used to search Applicant's home and secure evidence and directed Respondents to address the merits of the claim.

Respondents assert that, assuming Claim Six is a challenge to the validity of the search warrant, the claim is not cognizable in a federal habeas proceeding where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim.  Respondents further contend that prior to trial Applicant received an evidentiary hearing on each of his Fourth Amendment claims, during which the trial judge considered the matter and made detailed findings, and the CCA conducted a thorough appellate review.  Respondents conclude that federal habeas review is barred under **Stone v. Powell**, 428 U.S. 465 (1976).  Where the "State has provided an opportunity for full and fair litigation of a Fourth Amendment claim," a state prisoner is not entitled to

federal habeas corpus relief on the basis that evidence obtained in an illegal search or seizure was presented at his trial. **Stone**, 428 U.S. at 482.

The Tenth Circuit has determined that the meaning of the phrase, "[o]pportunity for full and fair consideration includes, but is not limited to, the procedural opportunity to raise or otherwise present a Fourth Amendment claim. It also includes the full and fair evidentiary hearing contemplated by **Townsend** [**v. Sain**, 372 U.S. 293 (1963), **overruled in part on other grounds by Keeney v. Tamayo**, 504 U.S. 1 (1992)]. Furthermore, it contemplates recognition and at least colorable application of the correct Fourth Amendment constitutional standards." **Gamble v. State of Okla.**, 583 F.2d 1161, 1165 (10th Cir. 1978) (internal quotation marks omitted). "Thus, a federal court is not precluded from considering Fourth Amendment claims in habeas corpus proceedings where the state court wilfully refuses to apply the correct and controlling constitutional standards." **Id.**

The trial court held a hearing to determine whether probable cause existed for the three different search warrants. During the hearing, counsel for Applicant conceded that probable cause existed for one of the warrants and withdrew a motion to suppress regarding another of the warrants. Sept. 26, 2003 Hr'g at 187-88. Only one warrant remained before the trial court to determine if probable cause existed. Oct. 9, 2003 Hr'g at 2-3. The trial court found as follows regarding the remaining warrant:

> The Court will therefore turn its attention to the Gysin warrant and whether or not there was probable cause for said warrant.
>
> The Court notes that the Court must look at the four corners of the affidavit. Also, to establish probable cause, the affidavit supporting the warrant must allege facts sufficient to cause a person of reasonable caution to believe that contraband or evidence of criminal activities is

located in the place to be searched.  The affidavit must establish a fair probability that the officers executing the warrant will find contraband or evidence of a crime at the location to be searched.  That comes from **People v. Kazmierski**, 25 P.3d 1201.

A court must analyze the sufficiency of a search warrant in terms of time, crime, objects and place.  In addition, probability, not certainty, is the touchstone of reasonableness.  Also, that the public policy encouraging warrants dictates that probable cause be reviewed with deference to the issuing magistrate.  That comes from **People v. Gall**, 30 P.3d 145.

With those cases in mind, the Court turns to the four corners of the affidavit.  The search warrant attachment specifically identifies the address to be searched, 850 East Bennett Avenue, and in addition, describes how the house is painted.  This is enough particularity as to the location to be searched.  The affidavit goes on to state that per a fellow officer, the applicants [sic] knows that the patrol officers were presently at the scene of a possible attempted suicide.  The reporting party stated he called 911; that his girlfriend just shot herself in the head.  There was brain matter all over the place.  The female is pregnant and the gun is on the nightstand.  Also, medical personnel had responded and transported the victim.  The utilities for the location did list to Daniel Self.

This is sufficient probable cause to pass constitutional muster.  They were investigating a possible suicide, certainly a death, because the affidavit states that the victim was not expected to survive.  We have a shooting where a person most likely will die and a witness who sees that there's evidence of the shooting inside the home.  This is part of an ongoing investigation of a matter that may be a crime.  Note, the attachment states possible suicide; but, indeed, the police report 03-10524, which the affiant had personal knowledge of, states suspicious circumstances.  There is a link between suspected criminal activity and the specific location to be searched.

The Court will deny the motion to suppress.  The Court finds that Attachment B, items to be searched for, are stated with sufficient particularity and are related to the shooting itself.  For example, they are looking for indicia of occupancy, blood, hair, fibers, guns, and evidence relating to weapons.  The Court also notes that there's also no staleness

 issue and it is appropriate for the affiant to reply on information from fellow officers.  So the motion to suppress the search warrant is denied.

**Id.** at 2-5.

In review of this issue on appeal, the CCA found as follows:

Self argues the trial court erred in denying his motion to suppress evidence obtained pursuant to the search warrant of his home because the warrant not only did not allege probable cause to find evidence of criminal wrongdoing, but also did not allege any wrongdoing. Even if we assume the warrant was deficient, we conclude that the police properly entered the home pursuant to the emergency aid and consent exceptions to the warrant requirement.

The United States and Colorado Constitutions prohibit unreasonable searches and seizures. U.S. Const. amend. IV; Colo. Const. art 2, § 7. A search warrant must be based upon probable cause as stated within the four corners of the supporting affidavit. *People v. Randoph*, 4 P.3d 477, 481 (Colo. 2000). "Probable cause exists when an affidavit for a search warrant alleges facts sufficient to cause a person of reasonable caution to believe that contraband or evidence of criminal activity is located at the place to be searched." *Id.* (quoting *People v. Turcotte-Schaeffer*, 843 P.2d 658, 659-60 (Colo. 1993)). We defer to a magistrate's probable cause determination, and therefore, we must determine whether the magistrate had a substantial basis for issuing the search warrant. *People v. Hebert*, 46 P.3d 473, 481 (Colo. 2002).

Warrantless searches are presumptively invalid unless they are justified by one of the established exceptions to the warrant requirement. *People v. Allison*, 86 P.3d 421, 426 (Colo. 2004). As relevant here, police may enter a home if necessary to provide emergency aid or pursuant to valid consent. *Allison*, 86 P.3d at 426; *People v. Reynolds*, 672 P.2d 529, 532 (Colo. 1983).

A search pursuant to the emergency aid exception requires both an immediate crisis and the probability that assistance will be helpful. *People v. Pate*, 71 P.3d 1005, 1011 (Colo. 2003). A prompt and limited warrantless search of a scene at which violence has occurred may be necessary to determine whether there are any injured parties or whether the perpetrator of the violence is still on the premises. *People v. Thompson*, 770 P.2d 1282, 1285 (Colo. 1989).

Furthermore, when police are legitimately on a premises pursuant to an exception to the warrant requirement, they may seize incriminating evidence in plain view. *Reynolds*, 672 P.2d at 532. If police observe evidence pursuant to the plain view exception, they may later return to the site of that evidence to collect it and to make scientific measurements and diagrams for later use at trial. *Id.*

Here, Self call 911 and stated that his girlfriend had shot herself in his home.  He said the gun was his and was on the nightstand.  He told the operator that the victim was a heroin addict and was seven months into an unwanted pregnancy.  He also stated that he was diagnosed as bipolar that day.

An ambulance responded and entered the house to attend to the pregnant victim, who was still alive.  Paramedics attempted to stabilize the victim and protect the life of the fetus.  While paramedics were attending to the victim in the house, Officers Reed and Mann arrived at the scene.

Officer Reed entered the home and observed medical personnel assisting the victim.  He directed Officer Mann to take pictures of the scene.  The victim had a large amount of blood and brain matter on her head.  Officer Reed spoke with Self for several minutes and two to three minutes later returned to the bedroom to determine the precise location of the incident.  He observed a handgun on the nightstand.

While Officer Reed transported Self to the police station for the GSR test, Officer Gysin applied for a search warrant.  The warrant application stated that Self's house was the site of a possible attempted suicide.  In addition, the supporting affidavit stated:

> The reporting party "Dan" (subsequently identified as Dan Self) called 911 advising that his girlfriend had just shot herself in the head.  Mr. Self further advised the dispatcher that there was brain matter all over the place, the female is pregnant [and] that the gun is on the nightstand.  He further advised that he is bipolar.

Self contends the court should have excluded the following items seized or observed by Officer Gysin pursuant to the warrant: (1) a copper bullet fragment; (2) blood and hair on the doorway header; (3) blood on the floor; (4) a pool of blood just inside the bedroom; (5) a stained quilt and blood-soaked brown blanket on the floor just inside the bedroom; (6) a possible bullet hole in the ceiling; and (7) a bloody Glock semi-automatic handgun on the table.  Self further argues expert testimony based upon this evidence was the fruit of the illegal search and thus must be suppressed as well.

We conclude that each of the listed items was in plain view when Officers Reed and Mann entered the home pursuant to an exception to the warrant requirement.

Therefore, even if we were to conclude the trial court did not have a substantial basis for concluding the search warrant affidavit stated that evidence of criminal activity was located at the place to be searched, the officers were justified in entering the property pursuant to the emergency aid and consent exceptions to the search warrant requirement. Officers Reed and Mann responded to Self's 911 call, in which he stated the victim was pregnant and had shot herself. The police responded to an immediate crisis, and it was likely that assistance would have been helpful to the victim and the fetus.

As part of Officer Reed's initial observations, he entered the bedroom where the medical team was assisting the victim. Officer Mann documented the evidence in plain view by taking numerous pictures. Those photos included pictures of each of the items Detective Gysin later collected or observed during his search pursuant to the warrant, including the bloody blanket, doorway header, carpet, gun, and bullet fragments. Although other officers later entered the bedroom to take additional pictures, to document the location of the evidence, and to diagram the room, their actions were permissible because the evidence was within plain view when Officers Reed and Mann first entered the bedroom. *See Reynolds*, 672 P.2d at 532.

In his petition for rehearing, Self contends that Officer Mann did not see all the evidence at issue in plain view because he did not photograph every piece of evidence. However, the plain view exception does not depend upon taking photographs of the evidence; it was not necessary for Officer Mann to photograph every piece of evidence that he saw in plain view in order for the court to determine that the evidence in question was in plain view.

Thus, we hold the admission of the evidence obtained in the search was not error, nor was the admission of expert testimony based on that evidence. *See People v. Huynh*, 98 P.3d 907, 913 (Colo. App. 2004) (appellate court may affirm judgment based on reasoning different from that of trial court).

*Self*, No. 04CA1542 at 17-23.

As I found previously in the June 15 Order, there is no clearly established rule of

federal law that states Applicant has a right to a decision by the CCA that is based on

the same grounds as the trial court. Both the CCA and the trial court applied the correct

48

constitutional standard for finding probable cause and if not probable cause for finding a colorable claim of an emergency and of plain view exceptions.

Based on the fact that the standard articulated by the CCA requires the existence of an immediate crisis and the probability that assistance will be helpful, *see Brigham City v. Stuart*, 547 U.S. 398 (2006), I find that the CCA made "at least colorable application of the correct Fourth Amendment constitutional standards." *Gamble*, 583 F.2d at 1165. Applicant was afforded the opportunity for full and fair consideration of his Fourth Amendment claim in both the trial court and the CCA. Therefore, consideration of the merits of Applicant's Fourth Amendment claim is barred by *Stone* and the claim must be dismissed.

### III. ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1. That the *pro se* **Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254** [#1 ] filed on March 1, 2011, by Applicant Daniel G. Self is **DENIED**;

2. That this case is **DISMISSED WITH PREJUDICE**;

3. That under 28 U.S.C. § 2253(c), there is no basis on which to issue a certificate of appealability;

4.  That leave to proceed *in forma pauperis* on appeal is denied;

5.   That pursuant to 28 U.S.C. § 1915(a)(3), I certify that any appeal from this Order is not taken in good faith, and, therefore, *in forma pauperis* status is denied for the purpose of appeal, *see Coppedge v. United States*, 369 U.S. 438 (1962); and

6.   That if Applicant files a notice of appeal, he must pay the full $455 appellate

filing fee or file a motion to proceed *in forma pauperis* in the United States Court of

Appeals for the Tenth Circuit within thirty days in accordance with Fed. R. App. P. 24.

DATED at Denver, Colorado, February 2, 2012.

**BY THE COURT:**

Robert E. Blackburn
United States District Judge